Good morning and welcome to the Ninth Circuit. We are sorry to have brought some of you all this way to Hawaii, and I'm sure you're terribly sorry to have come. We've scheduled 20 minutes per side this morning. You can save as much rebuttal time as you like. Good morning, Your Honors. My name is Robert Dreher. I'm counsel for the Governor and Attorney General of the State of Hawaii in this matter. And I would ask to reserve three minutes for rebuttal. Your Honors, this case raises issues of fundamental importance to the proper balance between the judiciary and institutions of democratic governance. Issues that go far beyond the particulars of the statute in question in this case. The extent to which this case marks a sharp and the State submits a dangerous departure from proper constitutional standards and from accepted traditions of judicial review can be seen from two facts. First, the plaintiff in this case stipulated that it is earning under the provisions of Act 257 a return on its lessee-dealer gas stations, quote, that satisfies any constitutional standards, close quote. Indeed, Chevron stipulated that it's receiving more revenue under Act 257 than it would have received under its own rent program, and it has never asked for compensation in this case. So how do you deal with the statute itself that has a very specific declaration as to purpose? Act 257? Yeah. The statute has a general statement of findings about concerns about concentration in the gasoline industry, sir. Anything else? There's no particular statement of purpose beyond that. Nothing about price or cost? No. No? Okay. What about lowering gasoline prices? There's nothing in the statute that indicates that the purpose of the statute is to immediately lower gasoline prices. The purpose the State has ascribed to the statute, and the courts have not asked for legislative findings from the legislature in other cases involving constitutionality of statutes, the State has attributed to the statute the intent to protect the consumers of Hawaii from the risks that the lessee-dealer network might be driven wholly out of business by the oil companies. That's not an irrational concern on the part of the State, since it's in fact a practice that has generated substantial controversy throughout the country and led to a Federal statute. Now, that might be an intent of the legislature. They nowhere explicitly stated that intent, did they? Not in the statute, Your Honor. And what did they say explicitly in the statute as to what their intent was? The statute... If anything? The purposes of the statute are, or at least the statements of findings that the legislature made at the beginning of the statute, are quite broad. And it's at excerpts of record 18 is the first place it appears. It appears also, of course, at the end of my brief, my opening brief. The petroleum industry is an essential element of Hawaii's economy. A complete and thorough understanding of the operations of the industry is required by the State government. This is the information-gathering part of the statute. Information and data is required, again going to the information provisions of the statute. Because Hawaii is a physically small and geographically remote economy, certain markets tend to be concentrated. And it then concludes, the markets for oil and oil products in Hawaii are highly concentrated markets. It points out that in a highly concentrated market, market prices tend to rise above competitive levels. Market prices persistently above competitive levels are harmful to consumers and the public. Barriers to competition tend to cause super-competitive prices to persist. That's interesting, actually. That's not really, none of that is a statement of purpose. That's all a statement of fact. That's right, Your Honor. It's in fact not. From which we could infer purpose, but none of it is a statement of purpose. It's not, in fact, common for the State of Hawaii or for other states to indicate the statement of purpose for the legislation. So we can infer purpose either from this or from other things or maybe everything that we've got in front of us. But there is no explicit statement of purpose. There isn't, Your Honor, but let me just say that in terms of the structure of the person, the State, of course, has consistently attributed a purpose to the statute, which is the purpose I identified of protecting consumers from the risk that the lessee-dealer network, independent price-setting network of dealers, would be driven out of business and replaced by company employees. That's a persistent problem nationwide. And the concern here was that if that happened, the oligopolistic, as a term for it, nature of the wholesale industry in Hawaii would pass directly through to the retail pricing. If there were only two price centers in the state of Hawaii, then you'd have an oligopoly at the retail level. Am I correct in understanding that this is an undisputed fact, that at the moment company-owned stations tend to charge less at retail than dealer lessee stations? I think that was what the evidence indicated. It was not disputed by the State. So if driving the lessee-dealers out of business doesn't change other things affecting prices, we drive the high-priced guys out. Well, of course, the concern of the State is that if you entirely replace lessee-dealers, who are independent price-setters, with company stations, the companies themselves directly set the pump prices for their own stations, you would reduce the retail market to two price centers. In that instance, there isn't any dispute that oligopoly could be harmful to the consumers of Hawaii. So the concern that you're alluding to, then, is that if the lessee-dealers, who now charge higher retail prices on average than the company-owned stations, were driven out of business, the low-priced, charged retail by the company-owned stations might not persist. I don't believe it's disputed that oligopoly can be harmful for consumer interest. And if oligopolistic prices... If there's such a thing as hornbook economics, that's it. I think that's right, Your Honor. And let me just also say that in terms of inferring the purpose of the statute, I mean, I believe we should take the State's attribution of purpose to this at face value. But the statute bears this out. The three provisions of the statute that are directly at issue, only one of them is challenged by Chevron, but there are three provisions of Act 257, and they're complementary. Section 3A prohibits oil companies from simply converting these stations to company stations. Section 3B bars oil companies from undercutting lessee-dealers by establishing company stations within a certain distance of existing lessee-dealer stations. And then Section 3C, which is at issue in this case, establishes a rent cap. And it's very important for the Court to bear in mind that the rent cap set by the statute is above the current rent being charged by Chevron for virtually all of its stations. Only 11 out of 64 stations are affected in any way by the rent cap. So the rent cap was not set by the legislature with any apparent intention, and the State submits without any intention, of reducing rents immediately for the benefit of lessee-dealers. It was established as a safety measure, as a safety net, as a ceiling upon the rents that could be charged. The fundamental issue here, Your Honors, I think, is that this statute was misunderstood by the district court, perhaps misunderstood by this panel in the prior opinion, as a rent control ordinance. It, in fact, is much closer in purpose to being an apartment conversion control. It's intended to prevent the conversion of apartments into condominiums, if you will. And those ordinances can directly preclude the conversion, as this does, but they can also go to indirect methods that a landlord might adopt, jacking the rent up really high to drive tenants out of a building. In that situation, there isn't any issue of trying to set reasonable rents or being worried that tenants might go elsewhere. That's the landlord's intent. So there isn't any market control any longer on what those rents might be if the landlord's intent is to drive his or her tenants out of business, out of the premises. And that's exactly the concern the State is addressing in the statute. If I could return, the fundamental anomaly here, as I say, is that Chevron has never sought compensation and, in fact, is making more money than it did before the statute was enacted. And yet the District Court found that the statute was a violation of the Fifth Amendment, the takings clause, which prohibits the taking of property for public use without just compensation. The second telling fact, we believe, is the simple statement of the proceedings below. The District Court, acting under this Court's mandate and its prior decision, held a trial to determine whether, as a matter of predictive fact, Act 257 would work. The trial consisted of an academic debate between two Ph.D. economists who disagreed on numerous complex issues of economic policy and economic theory. As Umbach and Leffler? Yes. In a telling moment, I think, the trial judge even looked to see if the demeanor of the witnesses would assist the Court in determining whether the statute was constitutional. And, unfortunately, it didn't help, so she was driven back to economics. That's right. Ultimately, the Court found, by a simple preponderance of the evidence, that the views of Chevron's expert were more logical than the views of the State's expert. The Court, therefore, concluded that Act 257 did not substantially advance a legitimate State purpose and declared the law unconstitutional. In simple fact, the District Judge substituted her view of the wisdom of this law for that of the Hawaii legislation, without any deference whatsoever to the judgment of that democratically elected institution. Well, didn't the District Court do exactly what we directed in the prior decision? Yes, Your Honor. I believe that's correct. And she was faced with the law of the case as you are now. She was. And proceeded to make the findings that she was directed to make. I am not actually making... I know you're saying we don't like the findings, and I ought to be upset. I'm not actually finding any fault with the District Court's conduct of this case, except to point out... You're finding a lot of fault with her finding a fact. The finding of fact, Your Honor, that the statute would be ineffective? Yeah. I do think that the... In that one particular argument, I do believe the Court made a finding of fact which should have resulted in judgment for its State. And that is my third argument. That, in fact, even if this case were properly tried in the fashion I just described, nonetheless, there was a finding of fact made by the Court that, in fact, should have compelled judgment. And that is that the statute would be effective in achieving the goal that I have just described to the Court, and that the State has consistently argued was the purpose of the statute. It would prevent the oil companies from driving their lessees out of business. And that was the purpose of the statute. And she made that finding. But if I could return, I think that the larger issue... Could I ask you just one question, and maybe you can help me out? Of course. I'm curious about the fact that, as I read the Act, Chevron can actually charge its dealers more in the aggregate than before, and that under this Act, Chevron can raise rents by more than a million dollars. And how does this further the goal of the statute, as you say? The statute, of course, does not direct Chevron to do this. The statute permits Chevron to charge up to that level. It is intended to be a rent cap. It quite honestly, from that fact alone, can be seen as not intended to immediately reduce the risk for the dealers or to in any way to try to drive up prices as they currently are lower. It's intended to prevent what would be, I think, a catastrophe for the island, which is if these lessee dealers got driven out of business by substantial and otherwise arbitrary rent increases. The only purpose for enormous rent increases would be to displace the lessee dealers, replace them with oil company employees, and allow the companies then, the only two oil companies that service the island, to then set pump prices between the two of them. If Chevron has or if Mr. X owns the fee simple title to the land and then enters into a ground lease with Chevron, Chevron puts the improvements on and then in turn leases to the dealer. If the ground rent is increased, can Chevron increase? Yes, Your Honor. And there's no limitation on the true owner of the property, the fee simple owner of the property, as to at what price he may lease in the future? None at all? No, not that I'm aware of, Your Honor. How is that effective to do anything? In most cases, Chevron is not the owner of the fee under the land. I understand that. So it would not, there's no suggestion that the fee owners of the land would have an intent to drive these lessee dealers out of business. Well, they want to make as much money as they can to compete in the high-priced economy of Hawaii, don't they? Yes, but they would be bound by market principles and how much they can afford to charge for ground rent. The premise of this case is that the oil companies, if they have what we believe to be effectively an illicit, unstated motive, but one which I think has been a common problem across the United States of trying to drive these dealers out of business so they can replace them, if they have that motive, then the amount of rent that the oil company might charge would have no constraint in terms of market principles because they're not concerned about the lessee dealers saying, if we quit, that's the result they want. But for the fee owner, I don't see any economic concern that they would try to drive ground rents higher than the market would bear because their purpose would not be to drive these people out of business. Well, depending upon who's paying taxes on some of those items, the tax rate is going to increase the cost of the ground owners' rent or cost of owning the land, and he's going to have to collect it someplace. It's going to come out of the people who buy gasoline, I take it, if it's going to be run as a gasoline station. I think that's true, but there's no suggestion that that would be improper or that that wouldn't be the normal functioning of the market. And it's not limited under this Act in any way. It's not constrained by this Act. This Act was aimed at a particular threat, a threat that the oil companies might seek to displace their lessee dealers. It is not intended to otherwise constrain them. So this whole Act is narrowed on one classification of people who use property. You're right, Your Honor. It's narrowed to the owners of these oil companies that are leasing these stations. That's exactly right. Now, the dealers are protected already to some extent under federal law, under the Petroleum Marketing Practices Act. Yes, Your Honor. And on your view of the statute, this statute, among other things, seeks to provide additional protection, not provide it under the PMPA. That's exactly right. Is there anything in the legislative history that tells us more specifically than what you've already told us just by reading the statute, that they were intending to supplement or increase the protection already provided under federal law? Your Honor, I have to confess, I've spent most of my career working with federal statutory materials and arguing about the intentions of the Congress, and there's substantial material there. But state legislatures do not typically provide legislative history. There is no legislative history. There are no committee reports. There's no opportunity to do what Justice Scalia would consider to be improper, which is trying to figure out what the statute means by going behind the plain words. In this case, we do have the plain words, and we do have the position taken by the state in this trial proceeding, throughout the proceeding, that this is the purpose of the statute. And I think, as I say, one of the problems that this case has faced on the facts has been that there's been sort of been ships passing the night. The trial court, and I think to some extent this court, believed that this statute had a different purpose, a purpose to immediately lower pump prices, and they couldn't figure out how the statute would work to do that. The state doesn't say it should. There's an interesting, almost philosophical problem here. If you don't have an explicit statement of purpose in the statute, and you are left to infer from the statute itself what the purpose is, how do we know that the purpose of the statute is anything different than its effect? Meaning, if its effect will be to protect the dealers, why is that not its purpose, absent some explicit statement by the state of some other purpose? I think that's very much the case. I mean, I would submit that the court ought to take the state's representation of the purpose of the statute at face value and determine whether the statute, in fact, serves that purpose. But, in fact, from the face of the statute, you can see that it does serve the purpose the state identifies. The cap is set higher than existing rents, higher than Chevron intended to set them. It's not intended to lower those rents. It's intended to stop Chevron from deciding at some point in the future about jacking those rents to sky-high levels. The other provisions of the statute are clearly aimed, Section 3A and 3B of the section we're concerned with, are clearly aimed at preventing conversion of these lessee-dealer statutes, lessee-dealer stations. So I think the purpose of the statute in this regard is carried out by the provisions of the statute. And what's clear is the statute is not intended to be a rent-control ordinance with the attempt to benefit the welfare of the lessee-dealers directly. If it's a rent-control ordinance, it doesn't seem to do very well if it's effective to rent only 11 out of 64 stations. I mean, if they're going to control rents, they didn't do much of a job of it. I think that's true, Your Honor. But as I say, I think the appropriate analog here is not to rent control but to apartment conversion. There are municipalities all across the country that have enacted valid ordinances sustained by the courts that attempt to protect apartment dwellers from having their apartments converted into condominiums for the profit of the owner of the property. And in those circumstances, there is no market level that will protect them if the owner intends to drive them out. The owner could set rents at an arbitrarily high level for the purpose of driving them out of business. This is that sort of statute, Your Honor. It's a cap upon rents. And that is when the State's positions were up. If I could return to Your Honor, of course, correctly points out that the burden that I carry is the law of the case in this matter. And that, of course, is why I don't think that the proceedings in the district court in themselves were anything other than the district court faithfully trying to carry out the mandate of this Court. What I do submit to you is that the fact of those proceedings is in and of itself a shocking anomaly in the history of this Court, of the Federal Court's jurisprudence. The State is unaware of any other instance in which a Federal Court has struck down a State statute based on a de novo review on the theory that the statute was ineffective, at least not since the era of Lochner. And it opens the door here, I think, Your Honor, to a very disturbing possibility that any socially or economic legislation that affects people's property would now be subject to plenary review in the Federal Courts under this theory. And, of course, under the Ninth Circuit's case law, they'd have an open invitation to come to the Federal Court to do so because, unlike the State courts, they would have no requirement of exhausting remedies. The ultimate irony here, of course, is that the Ninth Circuit has made its concerns about this kind of boundless judicial interference very clear in the Armand de Ries case. In the Armand de Ries case, they said the reason why normal claims about economic burden on property ought to be heard under takings, or in Armand de Ries it was a private use case, so the issue was the State was taking their property, was at least purportedly taking their property for private use. The reason why those should be heard under takings law is because due process law has been so discredited as permitting boundless review and also a concern about, I guess, attempting to avoid exhaustion requirements. Here, of course, now, this particular strain of the takings doctrine, which the State believes is unfounded in the Constitution, would permit exactly that kind of open-ended review. Your Honors, I have to say my time is rapidly approaching its end, and I would like to reserve time for my rebuttal, but, of course, I have barely touched upon the issues of concern to the State. If I could make just a couple more points. You know, our calendar is not particularly crowded this morning, and I think we would prefer to hear both sides out, so why don't we, I'll just do something very brave and give you an extra five minutes, and you can have as much, you can have the equivalent. I appreciate that, Your Honor. As I suggest, I think the process that took place in this case is a disturbing anomaly. It could not have happened, I believe, under any other theory of judicial review that the Federal courts engage in. You could not have de novo trial by a preponderance of the evidence to determine the constitutionality of the statute. The State thinks that that anomalous result comes from two basic errors committed by the district court and by this court with all respect in its prior opinion. The first is that as a matter of fundamental constitutional doctrine, challenges to the wisdom and effectiveness of regulations properly lie under the due process laws, not the takings laws, and should be decided by settled principles of substantive due process, including well-settled principles of judicial deference. Now, let me ask you about this. There's been some argument by Chevron that you can't inject due process into the case at this point because it's been tried so far on a theory of regulatory taking under the takings clause, which in a way strikes me as right, but it was Chevron who originally challenged the statute, and they challenged the statute under takings. They didn't challenge it under due process, and if their takings challenge fails, well, the regular due process question, whether it fails or not under due process, isn't in front of us. I agree, Your Honor, but if I could clarify, Chevron in fact alleged the statute violated due process, and they alleged that it violated equal protection. They voluntarily dismissed without prejudice those claims, preferring to advance this claim because, frankly, I can't speak for their motives, but the result is clear. They were able to obtain plenary review on a de novo basis of the merits of this statute only under this theory. They could not have done that under either equal protection or due process. But you didn't raise this issue, did you, until the petition for rehearing. Isn't that correct? You didn't raise the due process argument. That's correct, Your Honor. So you didn't argue that below? We did not argue that in the first go-round of the district court, where the court granted summary judgment to Chevron. We did raise that to this Court in our petition for rehearing. Well, it was the basis for seeking certiorari denied, right? That's right, Your Honor. I'm trying to figure out the consequence of your not having argued due process. The attack on the statute that persisted after they voluntarily dismissed their equal protection and due process challenges was regulatory taking. If the regulatory taking challenge fails, they lose. Boom. End of case. But they have not – they still retain the right to bring the claims under due process for equal protection. Well, in this case? Yes, because they asserted them and then took a dismissal without prejudice. So they can re-raise those claims. What about race to the counter? They have not adjudicated those claims. They have not reviled them. But that's a different question. But in any event, I think due process is not now in front of us. The only question in front of us is whether or not this is a regulatory taking. And if it should be analyzed under due process, that's a different matter. But that's not in front of us. Well, Your Honor, if I can say, the Ninth Circuit has not hesitated in other circumstances to tell plaintiffs that they have brought their claims under the wrong theory of the Constitution. And I'm going to reason in cases resulting from that decision, the Ninth Circuit has sent plaintiffs back to the district court and said, your claim is a takings claim. You've asserted a due process claim. But what's, of course, confusing there is that those are particular claims that lie at the heart of the takings clause, economic burden issues or freedom of access, exclusion of others claims. In this case, you have a claim which is at the heart of the due process clause. And what I do believe this Court can find is that this does not state a claim under the takings clause. I think that is compelled, in fact, by the majority of the Supreme Court in Eastern Enterprises. That fractured decision, it's an odd case in which to assemble a holding. But what is very clear is that five justices of the Court held that a statute that had challenged to the substantive wisdom of a statute could not lie under the takings clause. That was their holding. And I think that is dispositive of this particular case. If I could also say, however, that the heart of the State's case here, of course, is its concern that its judgment should have received appropriate deference. It clearly would have received appropriate deference if this case were properly recognized as a due process claim. But it's also the State's position that even if this were a valid claim of a taking, the substantially advanced doctrine which we think is unrooted in the text of the takings clause and does not serve its purposes, even if that were a valid claim, then appropriate deference should have been shown to the judgment of the legislature. There's no indication in the Court, in Agents itself, that there was any higher degree of review intended by the Supreme Court in that case. In fact, if I could just quote to the Court, this is something which is not in my brief, but I find it compelling. Agents, of course, relied upon an earlier due process case, Nectow, as support for its statement that something that fails to substantially advance the legitimate State interest would be worth a taking. Nectow itself observed that, and I quote, a court should not set aside the determination of public officers in such a matter unless it is clear that their action has no foundation in reason and is a mere arbitrary or irrational exercise of power, having no substantial relation to the public health, the public morals, the public safety, or the public welfare in its proper sense. And that, Your Honors, is at pages 187 and 188 of Nectow. And, of course, Nectow, along with Village of Euclid, those are all pre-New Deal, pre-court attacking crisis, pre-fundamental change in our jurisprudence cases. They are, Your Honor, although actually their restrained approach to substantive due process stands in considerable contrast to the cases like Lochner where the Court had fundamental economic principles that it thought were violated by constraining the right to contract. So they are good law, but they are clearly substantive due process law. Okay. Well, you know, we've used up 20 minutes, and we've used up five minutes. And why don't we give you a minute or two in rebuttal? Thank you, Your Honor. I appreciate your indulgence. And we will be similarly indulgent with Chevron. We're interested in the case, and we'd like to hear everything we need to hear. Good morning, Your Honors. Craig Stewart, appearing for Chevron USA. We submit the judgment should be affirmed because the district court correctly applied the standard that this Court held governs in Chevron 1, and further, that the Court's application of that standard was not clearly erroneous. Let me first address the standard. This Court, in its prior decision in this case, decided each of the points that the State is now arguing should be affirmed. To the contrary, first, the Court in Chevron 1 held that the takings clause applies, that this claim that the statute is invalid under the takings clause, that it does not substantially advance the legitimate State interest, is a valid claim under the takings clause. That was decided by this Court. Second, the Court in Chevron 1 decided that the first point was that this claim properly arises under the takings clause. The second point is that the appropriate test under the takings clause is that the statute is invalid under that clause unless it substantially advances the legitimate State interest. And the third point that this Court decided is that the standard is more than the mere rationality standard that would apply under the due process clause. Now, my understanding of the premise of Richardson and, to a lesser extent, of our earlier panel decision in this case, is the possibility of a premium capture. Was the fact, after we're finished with the trial here, what do we know about premium capture? There's two parts to that. Let me ask the second point first, which is what do we know about the premium transfer here. The district court found that there would be a premium created by this statute and that it would be captured. Yeah, okay, I have a problem with that. And if you would please turn to page 185 of the excerpt's record, I'll show you where my problem shows up. It actually runs bottom of 184 over the top of 185. Now, parenthetically, this is not either of your fault, but because of the way the duplication was done, the top of many of these pages is taken off. So it's very hard for me or for us in reading these to know who's testifying because it jumps around and so on. I think the pages, as you submitted to the photocopy person, had at the top, you know, Umbeck, Cross, or whatever, but they've been culminated in most of the pages that we've got. Nonetheless, I'm pretty sure I know who this is. This is Professor Umbeck. I believe it is, Your Honor. And at the bottom of page 184, in response to a question by the court, who's talking about, well, how much of the rent loss is the oil company likely to recover by increasing the deal of tank wagon price, the wholesale price? And the witness answers, well, even if the oil company doesn't recover all of the rent reduction, that is to say recover it by the increase in wholesale or the DTW price, that doesn't mean the dealer is going to benefit because the whole revenue stream is smaller. In fact, in all likelihood, both the dealer would lose and the oil company would lose. Where's the premium? I just heard from your witness that the dealer makes nothing out of this. And therefore, why isn't Judge Malwais fact-finding on the point of premium clearly erroneous? Because your witness squarely contradicts that. I don't believe that he was saying that the dealer, that there would be an absence of any premium. I think he was saying that. Well, premium means the dealer makes money. And he's just said the dealer and the oil company, quote, in all likelihood, close quote, will lose. So he makes no money, he makes no premium. I believe his point was that the oil companies will raise, have an incentive to and will raise the DTW to try to recoup some of the rent that they are unable to recover. Right. But they will not be able to fully recoup that because raising that will cause the dealer to raise the retail price, which will result in reduced sales volume. Right. I'm fully in agreement with you. So there's a gap there. There's a gap there in terms of the oil company is not going to make as much money as it previously would have made. But that's not a premium. The premium is that the dealer makes money. The dealer, under his testimony here, makes no money. Not only does the oil company lose a little money, just as you have described, the dealer loses a little money, as he has just described. So, again, I don't see the premium. Loss on both sides. No gain on either. I haven't focused on this particular point, but let me answer that by sort of an alternative way, which is to go back to the first point that Your Honor made about the standard here hinging upon the existence of the premium. Yeah, right. There's something to be talked about here. Yeah. And our contention is that certainly the existence of the premium shows that the statute is not going to accomplish the purposes of the statute. And I'm sorry to interrupt, but I want to make sure I understand what you mean by purposes. Are you excluding from purposes the protection of the dealer lessees? Yes, Your Honor. That's what I thought, but I want to make sure. Well, let me back up on that. However the purpose is defined, whether it's defined as protecting the lessee dealers in and of themselves, or whether it, as we believe, the state is focusing on its ultimate end of the problem it was addressing of super competitive, what it viewed as super competitive pricing to the consumers. Whichever way you view that, our contention is the premium, the capture of the premium, just as in Richardson, is a relevant factor to determining whether the statute substantially advances the state's interest. You think it's a relevant factor? Yes. I just want to make sure I heard you correctly. And that is the point I'm getting to, Your Honor. It is not the critical factor that in its absence there would be no claim. But as I read our initial panel decision, the possibility of premium capture was the premise upon which the substantially advances test was applied in the first place. And now I see, according to your own witness, there is going to be no premium capture. So what happens to the test? The possibility is enough to trigger the test. And then when we find out that the possibility doesn't exist, according to your own witness, we nonetheless apply the test? The prior briefing in this, in the earlier appeal in this case, was addressed to the premium because that had been the focus of the summary judgment briefing and of the court summary judgment ruling. And the premium was also the focus of the decision in Richardson. But the substantially advances test and the standard of review that that imposes has a long pedigree, wholly apart from cases in which a premium is at issue. In the Yee v. City of Escondido case, the Supreme Court referred to the premium there as something that would bear on a regulatory takings claim. But this prong of the regulatory takings test has been asserted and reasserted and reiterated by the Court on numerous occasions. By the Supreme Court? Yes. And the only case I'm aware of in which the Supreme Court has said premium capture might trigger the substantial interest test is this dictum in Yee. What other cases are you talking about? My point, Your Honor, is that the Court, in the number of other cases not involving a premium, have held that the takings clause imposes a substantially advances requirement. It does in the zoning and land use regulation cases. I entirely agree with you. And the Supreme Court's cases are not limited only to a zoning case. But why should it apply to rent control? Excuse me? Why should it apply to rent control cases? Well, the collection of rent is one of the prime attributes of a property interest. It's one of the principal interests that a property owner has is the ability to charge rent for the use of that property. And I don't believe the State can test that the restriction on rent is a burden on a specific property interest that triggers the application of the takings clause. They assert that the standard is lower than what this Court held it to be and what the Supreme Court has held it to be. But they don't dispute that that is a specific property interest such that the takings clause applies here. My point is that the substantially advances requirement imposed by the Court's decisions has been applied across a spectrum of property interests, not limited to rent control and not limited to rent control. Not including rent control, I think you should say. Yes. Richardson, of course, held it applies here. I'm talking about the Supreme Court. Richardson, we did in rent control. You're absolutely right. Yeah. And I don't believe – I think that in Richardson, the existence of the premium was not the basis for the Court's conclusion that the takings clause applied or that the substantially advances requirement must be imposed. Instead, it was the basis for the Court's conclusion that it would not substantially advance. So even if it were true, Your Honor, that in this case there would not be a premium, the district court's other findings establish that this statute would not substantially advance the State's interest. And those findings are that it will either lead to an increase in retail prices contrary to the State's interest or, to the extent that it doesn't do that, it will create a disincentive to the oil company investment in lessee dealer stations, again contrary to the State's interest. How do you respond to the argument of the State that at least one of the purposes of the Act is to protect the dealer lessees? How do you exclude that as a purpose, which I understand you would like to do? Yeah. Well, I guess my point, Your Honor, is that even if that were the purpose, it would still – this statute would not substantially advance that purpose. But I think that the – Well, I'm not sure that – you may then be bumping up against some findings in the district court on that point. I'm not sure that there's – the Court concluded that the – the Court said, admittedly, this statute will prevent future rent increases. But the question is, does the statute in its overall effect advance the ultimate State purpose of lowering prices for consumers? No, but you're back to saying what the purpose is and saying the ultimate State purpose is lower retail prices. I'd like you to go back, if you could, and we were there for a minute, and then I think I got you tugged away from it. Give me your best argument as to why we should not read into Act 257 as one of its purposes the protection of the dealer lessees. If the statute were designed only to protect a group of – Again, I did not say only. I said as one of its purposes, so maybe you want to stick with my question. Okay. That purpose to protect dealer lessees, apart from any benefit that may accrue to consumers or to a larger body of the public here, I believe would run afoul of the public use requirement of the Takings Clause to have a statute that the legislature enacts a statute to say, we want to take this group of 65 lessee dealers or 150 lessee dealers in the State of Hawaii and keep them in business. Apart from any good that may do to anyone else, we want to protect those people's business. I don't see the public use in that kind of a statute, and I don't believe – Wait a minute. Where did the public use doctrine come from? I think I understand the doctrine, but where did it come from in this argument? The Takings Clause requires as a precondition – Yes, but the question is, is this a taking? I'm after a much simpler question, which is to say, how can we exclude from the purposes that the legislature had in mind in adopting this Act the protection of dealer lessees? I'm not there. I haven't heard an answer yet. Okay. The point I was trying to make, and I'll move on to a different point, but just to try to make myself – No, I don't mean to cut you off. I just said maybe I didn't understand the point. I'm trying to make myself clear on that point. Yeah, please. In determining what the state was intending to do here, it would be, I think, improper to ascribe to the state an attempt simply to protect a very small group of private businesspersons wholly apart from any benefit that may be existing to the public. The state and the federal government protect various small categories of business all the time. And where the statute would run afoul of the Takings Clause, where it burdens a specific property interest, one of the requirements is that there be a public benefit. In the Pennsylvania coal case, the court struck down the statute, having determined that it was enacted just to protect a very limited group of landowners. And I think that it would be improper to ascribe to the state a purpose to do something similar to what was done in Pennsylvania coal. Okay, I've got that argument. Improper to ascribe, and therefore we will not ascribe. And let me buttress that by referring to the state's legislative findings or declarations in the statute. This is on pages 18 and 19 of the excerpt's record, where the state refers to Hawaii's remote economy, market concentration, and states that in a highly concentrated market, market prices tend to rise above competitive levels. Market prices persistently above competitive levels are harmful to consumers and the public. Barriers to competition tend to cause super competitive pricing. I think that this is background to what the state is doing here. The counsel for the state has said that the state has persistently ascribed to the statute, has attributed to the statute a particular purpose. And I think that choice of words is significant, because this, in fact, is all sort of an after-effect effort by the state and its lawyers and its experts to come up with a rationale and a purpose that they consider to be furthered. Why shouldn't I construe the words that you just read to us? In a highly concentrated market, market prices tend to rise above competitive levels. Why shouldn't I construe the phrase highly concentrated market to include reference to the retail distribution network? And the state is saying, well, part of that retail distribution network is the deal with lessees, and we're trying to protect that part of the market so that it doesn't get unduly concentrated by eliminating it. In fact, the state's expert conceded on at least one or two different occasions that the state was referring here to wholesale concentration because there is no concentration at the retail level. Well, there is none now. Right. But when the court here is- And Dr. Loeffler is a legislative history expert? When the state says it has consistently ascribed to the statute a particular purpose, one of the things it's relying-in fact, the only thing it's relying upon are statements by its expert witness and its lawyers in this litigation. So I think it's appropriate to look to see what the state and its expert have stated. Fair enough. But I think the fundamental point here, Your Honor, is that this statute, this statement of declaration, makes clear to me that protection of the lessee dealers is not an end of itself. In and of itself, it was sought by the statute. It was an intermediate step to the state's ultimate goal of preventing what it believed were super competitive pricing. And that is why we believe it was appropriate for the district court to consider the overall impact of the statute. And the court's findings are that it will cause prices to increase, and to the extent that it doesn't, it will decrease the incentive for oil companies to invest in the lessee dealer network. Now, the state's response to that is to analogize this to an immunization program and to say the fact that there may be some incidental side effects, and in this case the side effects are to cause the very symptoms, disease, that the state says it's seeking to prevent. But the state says those incidental side effects, I don't think they can be dismissed as incidental, are unimportant because of the ultimate long-term goal that the statute serves of protecting against an even worse disease. Given the standard of review that we are under here, the state should have, there should be some basis, some evidence, some support for the notion that that risk exists. And the district court found that it was, there is no such evidence, that there will be predatory rent increases to drive out lease dealers from business. The state says, well, again, refers to repeatedly this type of evidence, but there simply is none on the record. The facts are, the facts in the record are that the oil companies have done business through lessee dealers for years. Chevron has 65 lessee dealers and only a handful, less than 10, of company-operated stations. So there just simply is no basis for saying that there is this risk that we need to protect against, even at the cost of the adverse effects that the district court has found. I think I know the answer to this, but I'll ask it anyway. Do we have in the record any sort of timeline accompanied by numbers of company-owned and dealer lessee stations in Hawaii, either specific to Chevron or more general across the last, I don't know, 30 years or so? Do we know anything about this? There was an effort by the state's council on cross-examination of Chevron's expert to elicit that kind of testimony, to state that there is a trend toward or an effort by the oil companies to go toward company-operated stations. The fact is that that testimony was not forthcoming, and the testimony that did come out is that over the years there has been a continued large number company-operated stations. Now, for some companies, I mean, the percentage varies company by company, and I believe that in at least one case a company only operates through company-operated stations. That's outside the record. No, that is in the transcript. Oh, that's in the transcript. It must be in part of the transcript that I didn't get as part of the excerpts. It may not have been in the excerpts, Your Honor, because I don't believe that this was the focus of the briefing. I can look at the full record. I mean, the state's position, the state's argument in the briefing for the existence of this risk that we have to protect against, even at the cost of these adverse side effects, was that Chevron's expert, Professor Umbeck, has testified on behalf of oil companies in cases in which their own companies have been sued by lessee dealers. And the state cites that as evidence that, gee, oil companies must be on a campaign to eliminate the lessee dealers through predatory rent increases. In fact, if you read that testimony, it shows only maybe one or two cases where there were allegations, not judgments or findings. Now, if I read that testimony, is that testimony in this record? Or this is testimony he gave in other cases? No, no, no. This is in the transcript of this case. Professor Umbeck is being cross-examined by the state's counsel on this question. And if you read that testimony, you will see that it does not show, it shows at most one or two instances in which there have been allegations that oil companies have raised rents to drive out a particular lessee dealer. Given the evidence that oil companies have elected for years to do business through lessee dealers, the fact that in one or two cases a given lessee dealer has argued that that dealer was facing unreasonable rent increases doesn't establish the kind of risk that would justify the adverse effects and the burden on property. Have there been other terminations for cause, such as selling unbranded product and the like? Yeah, I don't believe that's in the record, Your Honor, but of course the agreements with the dealers as well as the governing statutes would entitle a company to terminate a dealer for cause. And I think another important point here is that the state, in ascribing to the statute of purpose that this was to protect the lessee dealers, has noted that in other provisions of the statute there is a provision that says that oil companies may not convert their lessee dealer stations to company-operated stations. And given that very specific provision that accomplishes exactly the thing that the state here is arguing, that was the purpose of the statute, what then is the purpose of the rent control portion of it? Oh, but I think you just said part of the purpose of the statute is to protect the lessee dealers. I think that's what you just said. And so you're saying there's another part over here that's not explicitly protecting them, which is rent control. But I think you've just conceded that the statute has as one of its purposes to protect the lessee dealer. No, Your Honor. No. My point is. You'd like to go provision by provision. This provision is this purpose. That provision is that purpose. The statute has its purpose to prevent what the state views as super competitive pricing to consumers. As means to that end, as intermediate steps to accomplish that ultimate goal, the statute seeks to protect the viability of the lessee dealers. But you can't evaluate that intermediate step apart from the ultimate effect on prices to consumers in the state of Hawaii. And that is what the district court did. In this court's prior opinion in this case, in the Chevron 1 case, the court referred to the district court's finding that the purpose of the statute was to protect low prices to consumers. And the court stated that the state has not disputed that finding. And that, I think, is correct. I think the district court was correct and this court was correct in identifying that as the ultimate purpose to be served by this statute. And so in determining whether the statute will substantially advance that interest, I think we have to look at that interest. And it's not enough for the state simply to identify one little narrow thing that the statute accomplishes and says that because it accomplishes that thing, therefore, it substantially advances the state's overall interest. The state has also pointed to the PMPA as evidence that lessee dealers are at risk of being run out of business for predatory price increases. But again, it's the same point as with respect to Professor Umbeck's testimony. The fact that there's a federal statute that was enacted to prevent conversion of lessee dealer stations does not establish that, in fact, the oil companies, aside from individual instances in which a particular lessee dealer may be complaining about rent increases, was concerned with an overall campaign to rib the entire market of all lessee dealers. Again, we have to remember that here we have what the state concedes is a highly unconcentrated market. Okay. You've run over. If you'd like to sum up for a minute or 30 seconds, if you've got a wrap-up. I guess the point I would like to make, Your Honor, is that the state portrays this as a case that is unheard of in the annals of jurisprudence. Our contention is that the Supreme Court has on numerous occasions reiterated that the takings clause protects specific property interests. Where there are no such interests involved, the takings clause does not apply. But where it does apply, that is a specific constitutional provision that is entitled to, that protects the rights of individuals. And it is not unheard of for the courts, in dealing with a specific constitutional protection of identified rights, to demand and to apply a higher level of scrutiny. The state relies upon the commercial speech cases, which is another area in which the courts have applied intermediate scrutiny. In those cases, the courts have required that there be evidence, not merely conjecture, to support, and findings to support a conclusion that the statute is going to achieve the state's assertive purposes. And here there is no such findings and there is no such evidence, and therefore we submit that the judgment should be affirmed. Thank you very much. Let's do two minutes, and then we'll rebuttal. Mr. Jager, I acknowledge your Honor. A couple of very quick points. The whole issue that I think Judge Fletcher started with about the capture of the premium, it was, of course, the State's contention that whether there might be a premium or not was ultimately irrelevant to their purpose, the purpose of the State, which is to prevent these deals from being driven out of business. It's like an apartment conversion provision. Maybe that will contribute some benefit to the apartment, to others economically. Maybe it won't, but the point is it protects their interest in remaining in possession. That's what the statute was intended to do. But it is, of course, ultimately one of the great confusions here in the record that Chevron's own expert waffled on this whole issue about whether there could be a premium. And it is irrational to suggest that the oil companies would jack up their wholesale prices because it's a matter of simple economics. If they did so, they'd lose money. They've already set their wholesale prices at the point where they get the most money from the gasoline. Well, and I don't think that's right either. There was a fair amount of testimony that it would not be administratively prohibitive for the oil companies to raise their dealer tank packing prices narrowly as to the dealers who had reduced rate as the rental because of the statute and that they could recover some of it. That was an ugly dispute, Your Honor. They're likely to recover a fair amount of it. I don't actually want to bog down on it because it's a finding of fact. We have not tried to contest it because it's very hard to do. But it was hotly disputed. In fact, I think it's irrational to suggest that they would try to lose money in that fashion. But in any event, the key issue here is I think whether this is actually the purpose of the statute that we've identified. There's a suggestion that there's no evidence of risk. The whole prior career of Chevron's expert was testifying in cases where lessee dealers were alleging that they'd been squeezed out of business by jacked-up rents. There's a federal statute that was enacted. Congress doesn't take a step like that lightly. If it's irrational for the State of Hawaii to think that this is a risk that the State should be concerned about, then I presume it's also irrational for Congress to have enacted the PMPA. The fact that the PMPA is in place doesn't mean that the State can't enact its own protections. And the key issue here is that the reason why the PMPA has been relatively ineffectual in helping lessee dealers and if you look at the cases, I cite one case in my brief, Duffy Marathon Petroleum, that's in my reply brief at page 28. The reason why they've been so unsuccessful is because they have to prove an intent. They have to go beyond the fact that they've been hit with a sharp rent increase. They have to show intent to squeeze them out. And then, as the Court appreciates, showing intent is always hard. This statute provides particular protection, therefore, by saying you can't raise the rents. It's an eminently rational approach.  They just can't raise the rents this high on you. So I think it's clear that this statute provides additional and different protection than the PMPA or that the other provisions have. The only other thing I would suggest is that the issue of protecting individual property rights, it is absolutely true that fundamental liberty interests, the First Amendment interests, these sorts of things, have been specifically protected by the courts for a long time. But if we have come to the place where property rights, per se, get that protection from all manner of social and economic legislation, then we are back in the era of Lochner. And I would simply say one more thing. I've heard Counsel for Chevron say that the purposes of the statute, which he disparages, would not justify the burdens that it places on private property. And I beg the Court to remember the great anomaly of this case. There is no burden on their property. They're making more money than they made before. It didn't directly burden their property. And they really have no business being before a Federal court saying that this is a taking without just compensation. The Ninth Circuit has emphasized in the Washington Legal Foundation case, which then was affirmed by the Supreme Court, that it's a prerequisite for a claim of a taking that there be a taking of property without just compensation. Here, they don't even claim that they have lost anything. Thank you, Your Honor. The case of Chevron v. Lingle will now be submitted. I thank both Counsel for your very helpful arguments on both sides. We are now adjourned. Thank you.
judges: Beezer, Reinhardt, Thomas